The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention, as the Court is now sitting. God save the United States and this Honorable Court. Good morning, Counsel. I want to indicate in the beginning that we've allocated 25 minutes for argument. It's not necessary that you use the full 25 minutes, but I'll strictly hold you to that time limit, subject, of course, to the necessity of responding to judges' questions. So with that admonition, Mr. Ashman, you may proceed. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. I'm Dale Ashman on behalf of the related appellant, Mr. Thomas Proctor. A Safeway offered set discount cash prices, and those cash prices represented the clear majority of Safeway's cash sales. Under any formulation of Safeco, and even subject to this Court's recent super value order, it was unreasonable for Safeway to deny those prices to government health care programs. The recent super value opinion informs that the Sienta standard adheres reckless disregard. As such, a key question pursuant to this Circuit Court's King-Vassil case is whether Safeway had reason to know facts that would prompt a reasonable and prudent inquiry about the possibility that it might be submitting false claims. This Court in super value wrote in its omnibus definition of usual and customary pricing that general public is subject to a few interpretations and may mean discount prices applied to all customers, prices most frequently charged, and or any discount program offered to the public. In the case at bar, Safeway's discount programs satisfy all of the super value interpretations. Discount prices apply to all customers through fixed formulary prices. Discount prices appearing on those formularies were most frequently charged, and the discount programs were freely offered to the public. Mr. Ashman, before we get too far down the road, can you hear me okay? Yes, Your Honor. Okay, thank you. Before we get too far down the road, I want to ask you a question about Medicare versus Medicaid. And you're referring to charges to the general public, the Medicaid definition of usual and customary. And I know in our super value case and in GARB, there was an agreement that the Medicare definition would be the same as the Medicaid definition. In some of the briefing below, your client seemed to be arguing that the Medicare definition was a little bit different, and there might be some support for that in the regulations. But you seem to have moved off of that argument. I would like to confirm with you, are you in agreement for purposes of your argument today that the Medicare and Medicaid definitions of usual and customary are the same and that we should follow the Medicaid definition, the charges to the general public? Your Honor, I would say that they mean the same thing to the extent that they can be distilled to mean cash price to the general public. But the Medicaid definitions vary from state to state. And so to the extent that that variation exists, there's certainly a question of fact. A question of fact as to what? As to what it means or what the price is? How the Medicaid programs define them, Your Honor. How is that a question of fact? Well, I suppose the substance of that, of those definitions is law. But as a matter of fact, they vary from state to state. So this seems to be even a little different than what you were arguing below. For purposes legally, while there may be different facts applied in different jurisdictions, are you in agreement that the definition we should work off of is the cash price charged to the general public? The cash price to the general public is the distilled definition used in Garvey. And so for today's purposes, I think we can work with that. Okay. And in SuperValue, we use that too. But there was an agreement that it meant the same. So go ahead. You may proceed. Thank you. Well, in the case of our Safeways Discount Program, satisfy all the criteria that laid out in SuperValue. It argues in its own supplemental brief that its discount prices were not its UNC because enrollment wasn't automatic and that discount prices are UNC only if applied to all customers. That interpretation is objectively unreasonable for several reasons. First, with respect to all customers, that reasoning, in plain language, a usual price is exactly that, a usual price. It's not an all or nothing proposition. Under Safeway's all or nothing proposition, if Mr. Jones alone buys a drug at a higher price than the discount price, Safeway could contend with a straight face that its usual price is that higher price simply because Mr. Jones, for whatever reason, paid a higher price. That's not an objectively reasonable use of the English language. Fixed prices were available to cash customers at Safeway, just like Walmart and just like Kmart. It's unreasonable to suggest that a fixed price is something other than a usual price. Now, with respect to program enrollment not being automatic, under the summary judgment standard, relators have presented evidence that enrollment in Safeway's clubs did not, in fact, require customer involvement and pharmacists were instructed to move cash customers to a club on their own. That R190-11 is documentary evidence of that. One cannot accept the factual predicate for how Safeway actually enrolled club members because it remains a material question of fact. Now, one more point about objective reasonableness concerning member enrollment. At page 8 of Safeway's brief, the Appalooh brief, it concedes that virtually every PBM contract it executed limits reimbursement to the lesser of UNC or the negotiated price. Question is, is it reasonable to deny the government the generic discounts being offered simply because a pharmacy asks a customer for an email address? Can Safeway's interpretation be objectively reasonable when it has the effect of end running that contract language with illusory conditions of its own creation? This is exactly the kind of flimsy device referenced in Garvey. The idea that customers could participate in Safeway's cash programs for free and simply provide some information is an even flimsier device than Kmart implemented to separate its own customers. At least in Kmart, they charged customers. Now, granted, Safeway may not have had the benefit of Garvey with respect to implementation of its own programs, but it's difficult, if not impossible, to read the Garvey opinion and conclude that the Seventh Circuit would have deemed Kmart's programs objectively reasonable under then existing UNC regulations. Now, the programs themselves that Safeway ran, again, Safeway identified its most commonly sold drugs and created formularies or lists of these drugs. Thus, Safeway had set discount prices for its best selling generic drugs. Even its price matching program used a formulary. Safeway's discount generic programs consist of the $4 generics program, the matching competitor generics program, and the loyalty membership program. They all use set price lists, just like Walmart. Across 11 divisions in eight years, Safeway created and administered these cash discount programs. Each of them used formularies that dictated the low set cash price for their generic drugs, just like Walmart, just like Kmart. There was a continuity of formularies. The $4 generics list was the same list as the matching competitor list. Mr. Ashman, how do you distinguish the objective reasonableness issue in this case from super value? Putting aside the authoritative guidance, I think that's a separate question. But the first part of the test and the objective reasonableness, what's the difference with this case? Well, your honors, the government is entitled to the lesser of the usual customary price or the negotiated price. In this instance, when you have negotiated, or excuse me, a reasonable interpretation, you have fixed prices here. Super value, as I understand it, turned out the way it did because it required a customer initiation to bring in a competitor's price. That's simply not present here. These were fixed prices offered at all times. And it was the majority of sales. Isn't there an issue of fact on that question, whether or not it's a majority of sales? Yes, your honor. I mean, it's it's it's your evidence. Your evidence shows both drug by drug division by division and year to year on all cash sales, right? That's correct, your honor. I mean, I understand that the defendant is disputing it, but that doesn't save it on summary judgment. It doesn't save the summary judgment. That actually inures to our benefit, your honor, that there's a to the extent there is a question of fact that's that's an issue of credibility for the jury. Can I ask Mr. Ashman? I think you made this point in your brief, but I want to because drug pricing can be so complicated, we're talking here about many years, all many, many different states and local markets and scores, if not hundreds of drugs. Is it is it correct to think that the usual and customary price issue needs to be decided ultimately drug by drug, market by market and in an appropriate time? I would certainly say, your honor, that it is a it must be a drug by drug inquiry. That's how I understand your position, however, to be that you've come forward with more extensive evidence here than in super value concerning national overall results for those top 20 drugs or or or overall where you put the data in, where you've got sixty five to eighty eight percent of cash sales of those drugs over years being made below what was reported to the government at UNC. And I, I understood that point to be that the overall data are pretty relevant in evaluating the statutory knowing standard. That's correct, your honor, the. The the way UNC is is established by by pharmacies typically is on a drug by drug. Our own expert identified these these these these drugs by looking at the generic product identifier. It's a 14 digit number that's hierarchical. So we could drill down not on not only on the specific drugs, but on their sales in given years and perhaps less so by programs. Is there is there evidence that the the so-called price clubs here were advertised? No, your honor. We we believe that's that's a matter for for trial. It's probably not. Do we know how the numbers got to sixty five to eighty eight percent, for example, of the top 20 sales, top 20 drug sales? Well, it's it's a it's the the drugs that issue here are high volume, high frequency maintenance drugs. And so, I mean, it's it's a reasonable inference from from the facts of the case that I mean, we can infer that that they were that they were advertising in similar fashion to super value. But the reason we didn't need to rely so much on that information at this point, your honor, is simply because, number one, we didn't have a full summary judgment briefing. It was it was strictly limited to Safeco in this case. And because we relied so heavily on what they actually did, the numbers, the actual sales numbers, you know, they jump off the page at you. We know they stipulated that they use formularies even for price matching. Now, we also know that that contrary to whatever opposing counsel wants to say, that the the denominators that we're using in this case to show the percentages strictly apply to cash sales. You know, the infrequency of of of cash sales to third party reimbursements doesn't diminish at all the import of cash sales. And that's the whole point of the case. The accurate identification of lower cash prices affects the third party reimbursements. Your honor, I'm going to need to save the remainder of my time here. All right, excuse me, but I just asked you quickly, Mr Ashman, to address this this question about what counts is authoritative guidance and why you think notice and comment require procedures should not always be required for guidance to be authoritative. Well, your honor, under the safeco case itself, there was no the FTC did not have rule making authority. And it said it even said it has only enforcement authority. So when it said authoritative guidance as a practical matter, as a logical matter, it could not have meant it simply could not have meant notice and comment. We did use the term guidance. As opposed to did you use the term guidance? Yes, your honor. So how should we define authoritative guidance? And what should we look to to define? Other than court of appeals opinions, what might fall into court to authoritative guidance? Well, in this instance, it's the Medicare manual is is one and it's it's directly germane. I understand what you're arguing that should be. My question is just a little bit different. How do we define legally what falls within authoritative guidance? So what's the test for us to determine whether or not the CMS manual is authoritative guidance? I think the first question I would answer is ask an answer. Is this is the government contractor under a contract where they agreed that they would follow literally whatever the agency says as part of their contract. And we know that that's the case in this case because of 42 CFR 423.505. Isn't the question that whether it's binding on the agency? Well, your honor, doesn't that get back to I mean, when you talk about binding and guidance, there's a disconnect there. So this is about guidance. And if you think about King vassal again, and reckless disregard, and what that means in terms of is there are there facts that puts a prudent actor reasonably so to make inquiry. Now, that's that's as much an issue in in, in this case, and the this circuits understanding of reckless disregard. So you must look at so for instance, the difference between objective and subjective facts. If I can use an example, if I walk out of my house, and I fire a gun fire bullet, whether I intended to fire the bullet, whether I intended to shoot someone, those are subjective facts. But the objective facts are, am I living in Montana, and I don't have a neighbor for 30 miles? Or am I on the streets of Chicago? Those are the kinds of facts that under the reckless disregard standard, a reasonable person can judge the conduct of the individual undertaking them. And so when when defendants like Safeway receive agency guidance, in whatever form, the question is what a reasonable pharmacy have asked questions about about that guidance. And we also have, you know, examples in this case where Medicaid specifically told Safeway, hey, you're doing this wrong. And their internal emails were, and that is, how are they going to know? Now, the question now, while you could easily say that's subjective, it's not. Because if you look at it from the perspective of a reasonable pharmacy receiving a notice like that, how should they respond? And what a reasonable pharmacy have said, well, we can stick our head in the sand because they're not going to know otherwise. Thank you, Mr. A. Now, Mr. Quinn, you may proceed. Thank you, Judge Keaney. May it please the court, John O'Quinn on behalf of the defendant Safeway. This court's decision last month in Schutte versus SuperValue resolves the principal legal questions in this case and compels affirmance. As in the SuperValue case, the alleged falsity at issue here turns on the interpretation of a disputed legal question. Namely, as a matter of law, what discounts, if any, may affect the usual and customary price charged to the general public by a pharmacy? And in this context, consistent with Safeco and the decision last month, objective reasonableness is a question for the court, like qualified immunity. Mr. Quinn, if the relator's version of the facts with respect to the amount of drugs sold at the discounted price is accurate, how does that impact our objectively reasonable analysis? I understand you disagree with that and you disagree with how they calculated that, but putting that aside, if they're correct that 80% or a significant amount, more than half of the drugs were sold at the discounted price, what does that do to objective reasonableness? Yes. So Judge St-Yves, I don't think that that changes the outcome here on objective reasonableness any more than it did when similar arguments were made in the SuperValue case. And I know both opinions in that case pointed to particular drugs over particular times where that was allegedly the case. But I think in some ways, this case is perhaps even more straightforward to think about in that regard because the principal difference between this case and the SuperValue case involves the membership club program. And the issue with respect to the membership club program is, was it objectively reasonable to believe that- Mr. Quinn, can you hold on? I'm sorry. We lost plaintiff's counsel. Mr. Asherman, can you hear us? Can you stop the clock? He's back. Okay. Yes, Your Honor. I'm sorry, Mr. Quinn. I got the video also. Okay. Could I ask you about this, Mr. Quinn, on the membership program? Because as I understand the evidence here for a while, Safeway did in fact report its discounted price matches, at least in some parts of the country, as is usual in customary prices, correct? Before you instituted the club? Yes, but I would quibble with the use of the term discounted in the way that you were using it, Judge Hamilton, and only in this. I think that's a term that gets used in a variety of ways. So for example, the Walmart program gets referred to as a discount program, but it's not in the normal sense of the term because that was the you were reporting in essence those usual and customary prices and then change policies when you introduced the membership club, correct? So Judge Hamilton, when we had a program that was like the Walmart program, where a price was automatically available to all customers who came in off the street without joining the program or anything else, then yes, we like Walmart report. I'm sorry, Judge Hamilton. Counsel, if you would please, we've read everything you all have to say. It's our opportunity to ask you all some questions at this point. As I understand it, you set up the membership club program and stopped on the theory that the membership took those prices out of the regulatory definitions of prices offered to the general public. Is that correct? Well, I mean, it is in the sense that when we had a... Is it not correct? Well, you're describing the prior program as being a discount program and I'm... Okay, I'm not going to quibble with you about that. I want to talk to you about what you think is different about the membership because it reminded me of another legal issue that turned on the difference between what a business offered to the general public and what it was offering to club members. We turn back to the Civil Rights Act of 1964, for example. Title II on public accommodations made exceptions for private clubs. Businesses that did not want to serve black customers started calling themselves private clubs, even though everybody white could join, and the cost was maybe 25 cents or a dollar a year. The Supreme Court had no trouble at all finding that those clubs were pretextual efforts to avoid the legal consequences of what was being offered to the general public. And given that history, I have trouble understanding why Safeway's pre-membership club might be deemed an objectively reasonable way of avoiding describing what you're offering to the general public. So, Judge Hamilton, first of all, I think it's well recognized that the concept of general public can take on different meanings in different contexts. And this court grappled with that involved different circumstances than here. I don't see how on TV helps you because those services were in fact available on offer to the general public. It's just that they could not be used by the general public, which is the statutory term there, unless you pay the subscription. And given your pre-membership club, I really don't see how on TV helps you at all. Well, I think, Judge Hamilton, the point is that on TV recognizes that there was a difference between whether something is available to all and whether or not it is given to all. And the analogy here that is most relevant is with respect to the discount card initiatives, for example, that existed that CMS laid out regulatory guidance on that predate. It's very tempting, I understand, to look at this case through the lens of hindsight and the subsequent Garvey decision. But the issues before the court are not whether or not these... I'm trying to look at it ex ante with what we know about clubs and the general public. Yeah. And that's why I bring you back to the analogy, for example, of the discount card initiative. It's discussed in our brief at page 54. It's a 66 Federal Register at 37569. And these discount cards, it's very clear from the CMS guidance that they wouldn't change somebody's usual and customary price. And those discount cards could only be available for a nominal fee. They preferred the fee to be zero. The maximum was $25. And it was limited information that they could collect. Customers had to have the right to opt out from receiving that type of information. And yet the discount card wouldn't change the usual and customary price for the reasons that were explained in that regulatory guidance. I think that's the more apt analogy. I think when you're looking at this from an ex ante perspective, you also have to look at the contractual counterparties both represented at the time and subsequently explained their understanding that cash discount networks, for example, Express Scripts, the largest PBM at R176-22, page 3, explained that that wouldn't affect the usual and customary price. Others like Optum, Medimpact, Medco, Caremark, all explained that they thought that there was a difference where you have a price that is automatically given to everyone who walks in versus one that people have to opt into, whether it's by taking the affirmative act of requesting a price match or taking the affirmative act of enrolling in a discount program. Does percentage of opt-ins matter at all for that analysis? What if 95% opted in and there was only 5% who didn't? At some point, does that matter? Well, Judge Senev, I appreciate the question and I appreciate that there might be some hypotheticals here. I think the fact that there may be hard hypotheticals goes to the objective reasonableness and the fact that if the government had wanted to put out a clear statement on this, it absolutely could have. Well, those are two separate questions. The objective reasonableness and authoritative guidance are two separate questions and you pronged the objective reasonableness. Is there some percentage of sales that you can get to through the membership or the special pricing, whatever you want to call it? Is there some percentage of sales that you could get to that it would no longer be objectively reasonable for you to call that the usual and customary price? I don't think, Judge Senev, that the percentage of sales would be what is ultimately relevant here. I think the question of what would ultimately be relevant is... So 99% cash sales through the membership club, those would not be the usual and customary cash prices? Well, Judge Hamilton, I mean, you can certainly imagine examples where you might have a small percentage of individuals, for example, who are... Please answer. What about 99%? Well, Judge Hamilton, I think the question is whether or not an affirmative step is required in order for them to participate. If so, I think it is objectively reasonable to not view them as the general public for these purposes. Now, if there's no... One percent of the people are not taking that initiative or are not being prompted by your pharmacist to take that initiative. Well, Judge Hamilton, first of all, the evidence in the record here, and in fact, at R176 of pages 5, 10, 17, and 22, we specifically argued at summary judgment that it required an affirmative step to join the program. And that was not disputed in their opposition to summary judgment. So, Mr. Quinn, though, even if it... What I'm trying to figure out is your response to, there is an affirmative step. I understand that, and I understand that's your argument. But is your argument that once there's an affirmative step, it's objectively reasonable regardless of what percentage of the public takes that affirmative step? That that affirmative step alone turns it into objectively reasonable? Or do you agree that at some percentage, it would no longer be objectively reasonable regardless of that affirmative step? Judge Steeve, I agree that if the mere act of walking into the store suddenly makes you a club member, then that is not... It's not objectively reasonable to think, okay, well, that means that you're not part of the general public. The reason that I'm hesitating on any particular percent here is, I guess there's the question of, do we mean for all transactions? Do we mean for a particular drug? And this was what I was trying to get at in my answer to Judge Hamblin's question a moment ago. You can certainly imagine a situation where you might have a relatively small percent of consumers who opt in. And the record here suggests that they certainly expected that it would be a relatively small percent of customers who would opt in. But regardless, that for whatever reason, because of the vagaries of a particular drug, it ends up that those small percent of customers end up being an outsized purchasers of a particular drug. Now, I think here the record is undisputed when you look at the numbers, that it is not all customers who walked in the door. And it is not all cash paying customers who walked in the door. And as in the super value case, you do have the Relators Council. But you're talking about walking through the door versus... I don't know that you're comparing it to the right factor. You're talking about comparing it to those walking through the door as opposed to those who have joined the membership. So I'm not suggesting that the Affirmative Act is walking through the door, that you have said the Affirmative Act is walking through the door. You've said the Affirmative Act is joining this membership. And at some point, is it ever relevant what percentage of, let's say, drug by drug sales go through that membership versus non-members? I don't think, Judge St. Eve, that on a drug by drug basis for purpose of objective reasonableness, that it is relevant what percentage goes through the members. I'm willing to accept that it may very well be that you may have some point where you would say there really was no Affirmative Act and it was objectively reasonable to recognize that because it is 99.9% of the people who participated. But I don't think... Whereas I do think falsity, whether or not they charged the correct price or reported the correct price for a particular drug, while I do think that that would be on a drug by drug basis, if the person who is part of my discount club is not part of the general public, then they just simply don't count. In other words, they're neither part of the numerator, nor are they part of the denominator. Just like people who participated in discount cards, which were recognized at the time, I would have thought would not be part of either, at least the numerator. And similarly, people who paid with insurance, who of course are an overwhelming majority of all customers, they don't count in the numerator or the denominator either because of the definition of usual and customary. But for the very same reason, if they are part of the club and it's objectively reasonable to think of in those terms, then they just simply don't count for determining what were the cash prices to the general public. Mr. McQuinn, I understand your position to be that evidence of subjective intent is not relevant here, at least at this stage of the case. But that's still open to some debate. And if subjective intent were relevant, you've done, I'm sure, plenty of fraud cases of different kinds. Do you think it would be reasonable to infer intent to defraud at the summary judgment stage from evidence here, such as we cannot put any of this in writing, and how will Nebraska know what we're doing with our discounts? Well, certainly, Judge Hamilton, I mean, I don't think that it's reasonable to infer some type of corporate intent based on emails over a decade from any assortment of employees. I think that they also are raising questions about what was an understanding at the time. And I think that what you have is just like in Purcell, just like in Purcell, you have the employees who are asking questions. And in Purcell, the testimony from them was that they believed that they were applying the wrong standard. And the court, of course, I'm not sure. I'm not sure that we can't put any of this in writing, this question. I take your point. Well, Judge Hamilton, I do think that what they were talking about there, as in SuperValue, they point to some email talking about a, quote, stealth program. And I think the context for documents like that was in contrast to something like the Walmart program, where they are actively advertising it, they are aggressively advertising it, and they are identifying concerns about not putting this out there, precisely not to put their competitors on notice. And the documents point to that. By the way, on the issue of advertising, Judge Hamilton, you've asked a question about that. It is addressed in a stipulation that was filed. It's in the record at R195-4, paragraph 8. And what that stipulation says is that some stores and some divisions did some advertising and some did not, and it varied. And so I do think there is sort of an inherent inconsistency here, though, between the theory that relators are espousing, that this was, on the one hand, an attempt to push everybody into the program, but on the other hand, to hide from regulators what they were doing. And in fact, the record reflects that CMS was aware that there were programs such as these. A former CMS administrator provided an expert report in this case. PBMs, of course, also provided evidence that they were aware of both the types of membership clubs, which they viewed differently, and price matching. And so there is a bit of an inconsistency there with respect to the relators. Steve? Mr. Quinn, could I ask you a question? Page 15 of the relators brief on appeal, it's not in tabular form, but it summarizes some of the high volume drug statistic. And my question is whether you agree that evidence, I don't want you to say it's undisputed, but simply do you agree that the evidence supports those numbers on page 15? Or do you think that there's evidence that the evidence just doesn't support them? Well, I don't think that this reflects, well, a couple of things, Judge Hamilton. First of all, my question is not about how relevant you think they are, what you think the right denominator is. My question is whether you think those numbers are supported by the evidence. I don't think that those numbers are supported by the evidence. I think they aggregate unrelated things. I think they focus on not the top 20 drugs. They focus on 1.3% of all cash sales, the so-called all drug sales, all cash sales of the so-called top 20, all cash sales of the so-called top 20, constituted 1.3% of all cash sales overall. And the numbers here that are used on this page combine both club price matches, which I don't think are relevant to either the numerator or the denominator, and price matches. And you could do the math and separate them out. And if you do, I don't think there's a difference between what was at issue here versus what was at issue in Superville. Mr. Quinn, I'd like to shift gears for a moment and talk about authoritative guidance. How should we determine the scope of authoritative guidance? We know Court of Appeals opinions are in there, certainly know something rulemaking coming from the agency would qualify. And let me make it a little more focused. Assume we think that the language you've identified in Van Straten is dicta and not binding. How should we define authoritative guidance? What should we look to to define it? Well, you took away my first answer because I was going to point to Van Straten. In the interest of time, I know. I think it's answered the question. But I do think that Van Straten is illuminating here, even if it is dicta. And much for the reasons that the Supreme Court articulated in Azar versus Alina, I think that for purposes of the False Claims Act, where you were talking about the consequences being treble damages. I mean, again, many of the questions today go to whether or not Supervalue was right or wrong. And that's a different inquiry than the Sienter inquiry. And where you're talking about the consequences being treble damages automatically, you're talking about penalties and so forth. I think that if those are going to be imposed, that it ought to be that somebody has violated something that has the force and effect of law, that that really should be the standard. Because otherwise, you find yourself in a difficult position, I think, both from a due process perspective, and also a in memos, suddenly carry all of these types of consequences, when in fact, if the agency was, you know, bringing a direct enforcement action, you know, Azar versus Alina tells you that it would have had to have gone through notice and comment rulemaking, as do cases like- But there's a big difference between a footnote in a memo and a manual, like the CMS manual, that's put out. So I don't think it's, it's, if it's not rulemaking, anything coming from the agency would qualify. So I'm looking and trying to figure out where do we draw the line? What do we look to, to define what those outer limits are? Van Straaten might provide some guidance, but I don't think it necessarily provides the answer. I don't think Safeco gives us the answer. So should we look to, to the Administrative Procedure Act case law, where they're talking about rulemaking versus guidance? Is there something else we should look to? Well, I think Judge St. Eve, that looking to, to the APA is, is helpful. I mean, I think, for example, if you look at cases like Guernsey Memorial Hospital, 514 U.S. at 99, and, and a case called St. Mary's versus Levitt, 535 F3rd at 807, you see the CMS itself has made clear that its own manuals won't be binding in its own administrative adjudicative processes, precisely because it's not binding on the agency itself. And I think that really is the issue, because if, I understand that the footnote, you know, it was originally in a memo, it finds its way into the manual. A few years later, it comes during the, the period in question, it comes out of the manual. And there's no sense that the agency was, was bound one way or, or the other by, and I think that really is the, the lodestar here in order to both have. The problem, the problem I have with, I, I understand in terms of sort of the philosophy of administrative law and, and your point about, about the consequences here, but what do we make of the Supreme Court's very conscious use of the word guidance? Well, I think that, you know, in cases like Christensen and Mead, you know, the Supreme Court is, has made clear that there can be things that have the force and effect of law that have not necessarily gone through notice and comment rulemaking. But, but they are, they are a select few. And, and so I don't think that the Supreme Court was necessarily saying it necessarily has to have been, but it has to be something that is tantamount to that. So they would be binding on the agency. I see I'm at the, at the end of my time. There is one other point I wanted to make on authoritative guidance with the court's permission. You may go ahead. Thank you, Judge Kaney. And that's this. I think that you can decide the authoritative, that it's not authoritative for the reasons discussed in our brief. I also think that you don't also don't have to, but there's been a lot of focus on the footnote of that memo, but I would encourage you to look at the body of the memo or the body of that section of, of, of the manual, because it also talks about, I talked earlier about the discount card programs and how that's really the better analogy. And that's what it's talking about in the body of the memo. It refers to the program, you know, get a better price. And, and it's inherent in it, but that's not changing the usual and customary price, because if it were, then they wouldn't need to switch over and pay cash. And that is also true, for example, of the Texas document, the Texas bulletin that they, that they cited in their supplemental brief as being purportedly authoritative, far from asserting that membership club prices would lower usual and customary, that Texas bulletin says that Texas Medicaid recipients are not disqualified from such clubs, but can enroll, which of course would be pointless if the club's prices automatically lowered the usual and customary price, they wouldn't need to enroll. I'm happy to answer any additional questions the I'll give you two more minutes on your time. Thank you, your honor. Well, first, this question about enrollment. Now, this is this is an example of why this is a question of fact, in this case, the division manager, Julie Spear, who's the director of pharmacy operations for Texas. She says to her to her division people, for each of the previous $4 generics, the pharmacy will need to process first on the patient's regular insurance to see what their copay is. And if it is more than the $4 generics, the pharmacy will need to reverse the claim then and then move it over to the membership. There's no volunteering on the part of anyone, there's no customer involvement in that process. They literally the disputed facts show that they implemented this program, and it was it was on autopilot, to the extent that there was that there is there's no basis, in fact, for that, at least at a minimum, it's a it's a material question of fact, on the issue of guidance. Now, even backing up from that, in the optimum contract, that that Safeway executed, and that's in the record at R dash 190 dash four, usually customary charge is defined as shall mean the price that a cash paying customer pays company for drug products, devices, products and or supplies. Now, that's there's no, there's no customer initiation there, there's no affirmative steps, it just says, usual customary shall mean the price that a cash paying customer pays period. There's no basis, there's no basis to to say that that somehow changes the definition by creating club or creating enrollment. Same contract on the aspect of what they agreed would be guidance. Medicare laws and regulations is defined as any and all guidelines, bulletins, manuals, instructions, requirements, policy standards, or directives adopted and issued from time to time by CMS. These guys as as Medicare contractors agreed to these conditions. Are these the contracts, Mr. Ashman that weren't before the district court at the summary judgment stage? That's correct, Your Honor, there were, there were two contracts in the in the record, based on the procedural scheduling of how how the the district court undertook summary judgment. Once he issued the Safeco opinion in Safeway's favor, we attempted to supplement the art, but these were not in the before the court, you had not put these before the court on the summary judgment question, correct? You tried to bring them in later. No, Your Honor, I understand the opt-in contract, what it was before the district court. Do you know where in the record that was? Well, I had, I've had the the record site of R-190-4 Exhibit I. Okay. But I guess if we, and is your argument, I'm sorry, is your argument that this should be authoritative guidance? And if so, how would that be authoritative guidance if it's not coming from the agency? I'm simply saying, Your Honor, that that in super value and Safeway, these defendants have argued that the CMS manual doesn't need to be followed. And I'm saying that they agreed by contract that it would be followed. But that might be, maybe there's something separate in terms of a contract issue. I'm trying to figure out how that fits into our analysis here. I thought you were trying to say that was authoritative guidance, but maybe you're saying something else. I'm saying simply, Your Honor, that that these are government contractors. And if we're going to look at the reckless disregard standard, as articulated in King Basel, you have to say what facts did they know? And they knew that they had a contract that should, in fact, have been guidance for them. Now, that CMS memo, by the way, which is in the record at R195-21, it references offer six times. And it's not an exhaustive example, but it says, basically, if you're offering a generics program, a generics cash program, akin to Walmart, for example, then that should be your reported UNC price. And one fact that's really gotten past the issues here is that the CMS manual is also pretty clear that two other things should happen. You should submit these claims to the Medicare program, because at the time, you had true out-of-pocket costs that had to be recorded on behalf of the beneficiary, and there was also a drug utilization review that should have occurred. Neither of those things could have happened by doing cash sales off the books. Now, this idea of walking into the store, or excuse me, I think I've covered that already, that CMS was aware, or the PBMs were aware, as Mr. O'Quinn mentioned. You know, if we're going to use that kind of evidence about what the parties that they work with were aware of, that looks a lot like subjective evidence. And if we're going to open that can, then I think it's where we should be entitled to offer the subjective evidence consisting of all the contemporaneous emails going back and forth at the time they were conducting these discount programs. Enforce an effective law with respect to authoritative guidance. You know, this isn't a question of materiality. Rulemaking is not necessary for authoritative guidance. I think SAFE goes fairly clear on that point. The Medicare manual of October 2006 is not our obligation. There is a federal regulation on point requiring them to comply with Medicare regulations. And the fact of the matter is, the sales numbers themselves reflect that SAFEway was profiteering at the expense in a very obvious way of the United States and the various Medicaid programs. I think that's all I have, Your Honor. Thank you, Mr. Gration. Thanks to both counsel, and the case will be taken under advisement.